IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| James E. Turner, Rebecca A. Forkner, Boyd J. Jones, Ernest E. Yarborough, and Locker Room, LLC, )<br><br>Plaintiffs, )<br><br>v. )<br><br>The Rams Head Company, a Delaware Corporation, )<br><br>Defendant. )<br>_____) | C.A. No. 3:05-2893-CMC<br><br><br><br>OPINION AND ORDER<br>ON<br>MOTION FOR SUMMARY JUDGMENT |

This matter is before the court on motion of Defendant, The Rams Head Company ("Rams Head"), for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Rams Head argues, in part, that there is no evidence of a joint enterprise or agency relationship between Rams Head and Jean Latendreesse ("Latendreesse") such that Rams Head could be held responsible for any actions taken or knowledge held by Latendreesse. Rams Head further argues that Plaintiffs' claims, which relate to property that was leased to Plaintiffs by Latendreesse but was owned by Rams Head, are dependent on such imputed knowledge.[1]

---

[1] The present order relates to the claims of Plaintiffs James E. Turner ("Turner"), Rebecca A. Forkner ("Forkner"), Boyd J. Jones ("Jones"), and Locker Room, LLC. The claims of Plaintiff Ernest E. Yarborough were dismissed from this action by order entered January 5, 2007. *See* Dkt No. 38 (granting summary judgment as to Yarborough's claims). The claims of Locker Room, LLC were added by oral ruling in connection with reopening of this matter on Defendant's motion and over Plaintiffs' objection. *See* Dkt No. 50 (Plaintiff's stipulation of dismissal with prejudice); Dkt No. 52 (Motion to Set Aside Stipulation of Dismissal filed after Plaintiffs sought the same relief through a state court action pursued in the name of Locker Room, LLC); Dkt No. 58 (minute entry granting motion to reopen action and adding Locker Room, LLC as a Plaintiff).

In response to Rams Head's motion, Plaintiffs expressly abandon any claim other than their claim for restitution.[2] They have, therefore, expressly abandoned their first cause of action for "Negligent or Intentional Misrepresentation: Imputed Negligence as a result of Joint Enterprise."

As to the restitution claim, Plaintiffs assert that Rams Head has received a benefit for which it has not paid, that benefit being the value of improvements which Plaintiffs made in the building which they leased from Latendreesse. As noted above, the building (hereinafter "Two Notch Property")[3] was owned by Rams Head.

Plaintiffs' also describe their dealings with Latendreesse which involved a series of leases. Plaintiffs argue that these dealings support the "unjustness" necessary to support their restitution claim because Latendreesse misrepresented his ownership interest in the property and because he was aware that Plaintiffs were making the improvements with an expectation either that they would ultimately be allowed to purchase the property or that they would, at the least, be able to continue the lease long enough to recoup their investment. Plaintiffs fail, however, to offer any evidence that Rams Head was aware of these dealings. The absence of such evidence is consistent with Plaintiff's

---

[2] Plaintiffs' second cause of action is inaccurately described in Plaintiffs' response to Rams Head's motion as "causes of action [for] unjust enrichment and restitution."

[3] There appears to be a great deal of confusion regarding the proper street number of the leased property. In some of the relevant documents it is designated as 6029 Two Notch Road and in some as 6201 Two Notch Road. According to Rams Head, 6029 is the proper street number. *See* Schwarz affid. ¶ 4 (statement of Rams Head's accounting manager). This is also the number used in the earliest lease and the only document suggesting that any Plaintiff ever acquired any rights beyond a short-term lease. Cleveland affid. ex. 2 (Turner Lease and option to purchase). Later leases and one Plaintiff's affidavit, however, indicate that 6201 is the proper address. *See* Forkner affid. ¶ 3; Cleveland affid. exs. 3 & 4 (leases); Cleveland affid exs. 5,6 &7 (subleases). Plaintiffs, ultimately, made no distinction between the addresses in their initial court filings, identifying both properties as the subject of their lis pendens and complaint. Cleveland affid. ex. 1. Whatever the proper designation of the property, it is clear that Defendant is entitled to summary judgment. The court will not, therefore, attempt to determine which address is correct and will, instead, refer to the property simply as the "Two Notch Property" in this order.

abandonment of their first cause of action. It is also fatal to their second for reasons discussed more fully below.

**STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)*; see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). Further, a party may not create a genuine issue of material fact by presenting two conflicting versions of events. *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue

3

of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").

## FACTS IN LIGHT MOST FAVORABLE TO PLAINTIFFS

Defendant Rams Head owns a building located at 6201or 6029 Two Notch Road in Columbia, South Carolina ("Two Notch Property"). *See supra* n. 3. At all times relevant to this action, that property was under the possession and control of Jean Latendreesse who had entered into a purchase and sale agreement with Rams Head but who never acquired title to the property. Schwarz affid. ¶ 7 (indicating that the agreement called for Latendreesse to make monthly payments of principal and interest, but that title has not been transferred because the payment obligations have not been fulfilled).

On September 1, 2002, Plaintiff Turner entered an agreement with Latendreesse to lease the Two Notch Property "together with [an] inventory of kitchen appliances." Cleveland affid. ex. 2 at 1 ("Turner Lease"). The lease indicates that the premises were to be used for a "Private Social Club/Sports Bar and Grill and Restaurant." *Id.* Latendreesse represented himself as the "owner" in the written lease and failed to disclose any limitation on his ability to lease or convey the property. Turner affid. ¶ 4.

The Turner Lease includes the following grammatically-challenged provision relating to alterations of the premises: "Alterations: Except as provided the law shall do no repairs, decorating or alterations done by Tenant without Owner's prior written consent." Cleveland affid. ex. 2 ¶ 4.A. Despite this provision, and despite the apparent lack of any other written consent, Turner made significant renovations to the property in order to make it suitable (or at least more suitable) for use as a club, bar and restaurant. Turner affid ¶ 4. Latendreesse was aware that Turner was making these renovations and condoned the same. *Id.*

4

On August 21, 2002, roughly two weeks prior to execution of the Turner Lease, Turner and Latendrese entered a separate agreement relating to the lease and Turner's possible future purchase of the property. This handwritten agreement, provided, in part, that Turner would rent the building for two years and, after two years, would "have the choise [sic] to buy at $170,000 or continue to rent till he buy." Cleveland affid. ex. 2.B. The court assumes for present purposes that this agreement was incorporated into the Turner Lease which was executed in September 2001.[4]

Turner and Latendreesse executed an addendum to the Turner Lease in November 2002. Cleveland affid. ex. 2.C. This addendum provides that Turner "promised to buy his lease property at the end of December 2004." It further asserted that Turner had made a deposit of $10,000 "to lock in the sale price of $170,000 until December of 2004 *or at the end of the lease whichever comes first.*" *Id.* (emphasis added). The addendum specified that: "This option is not a lease to buy." *Id.*[5]

Turner finished most or all of the renovations in a little over a year, but ran into financial difficulties in the process. Turner affid. ¶ 5. Turner estimates his investment in renovations, beyond his own labor, to be $89,500. *Id*. He also estimates that he increased the value of the property by

---

[4] The Turner Lease contains an integration clause which states that the lease, plus any attachments, "constitutes the entire lease between the parties and cannot be modified except in writing and signed by all parties. Owner, nor any agent or employee of Owner, has not made any representation or promise other than those set forth herein." *Id.* ¶ 24. The listed addenda include two items described simply as "other." For present purposes, the court presumes that the "option" agreement addressed above was one of these two "other" addenda.

[5] Turner states that he paid a $500 deposit on the lease in August 2001. Turner affid. ¶ 4. He does not, however, mention payment of the substantially greater option fee of $10,000. There is no other evidence as to whether this option price was paid and it is not mentioned in Plaintiffs' memorandum. Nonetheless, for present purposes the court presumes that it was paid and not later credited (as may well have been the case) against rent owed by Turner to Latendreesse. *See* Forkner affid.¶ 3 (stating that Turner was "deeply into debt" by the time Forkner joined the venture).

5

$140,000. *Id.*[6]

Because of his financial difficulties, Turner approached Forkner in August 2003, asking her to join him in advancing and funding his sports bar and restaurant project. Turner affid. ¶ 6; Forkner affid. ¶ 3. Forkner agreed, leading her to enter negotiations with Latendreesse and, ultimately, a lease which superceded and replaced the Turner Lease. Cleveland affid. ex. 3 (October 2003 Forkner Lease I); Forkner affid. ¶ 5 (stating she believed this lease "nullified Mr. Latendreesse's lease with Turner"); Forkner depos. at 23-24 (conceding her lease superceded Turner's lease).

Before entering the superceding lease, Forkner advised Latendreesse that she believed certain terms of the Turner-Latendreesse lease were "very unfair" and that she "wanted the lease to be rewritten in a more equitable way." Forkner affid.¶ 5 (not specifying what terms she believed to be unfair). Latendreesse refused to modify the lease terms. *Id.* Despite this refusal, Forker executed a lease agreement which was essentially the same as the earlier Turner Lease with the one exception discussed below. Cleveland affid. ex. 3 ("Forkner Lease I"); Forkner affid. ¶ 5 (explaining that she

---

[6] The initial complaint offered a similar valuation of the improvements and gave the same amount as the sums "invested," although this investment included payments made to Latendreesse (presumably on the lease). Complaint ¶¶ 26 & 29. Turner also offers a promissory note of $240,000 which he received from Locker Room, LLC as evidence of his investment of time and labor in the enterprise. (The note is for unspecified contributions).

The timing of this and a similar promissory note to Forkner are rather interesting. Both were executed by Forkner as president of Locker Room LLC. The note to Forkner was for $65,000 and was executed on March 15, 2007. The note to Turner was executed on April 3, 2007. The date of the earlier note (to Forkner) is precisely one day before Plaintiffs filed their stipulation of voluntary dismissal with prejudice in this action. *See* Dkt No. 50 (stipulation of dismissal filed March 16, 2007). The later note (to Turner) was executed one day before Defendant filed its motion to set aside the stipulation of dismissal based on Locker Room, LLC's pursuit of the same claims in a newly filed state court action. Dkt No. 52. The relative timing of the notes, dismissal, and filing of a new state court action on behalf of Locker Room, LLC, suggest strongly that the sole purpose of the notes was to place Forkner and Jones in a position to recover, through Locker Room, LLC, relief they affirmatively waived in this court. *See generally* Dkt No. 64 at 9-11 (discussing related events).

6

"signed the agreement . . . hoping that the money . . . from the club would eventually make right the inequity caused by the agreement").

Notably absent from the Forkner Lease I were any addenda addressing the purchase option. Indeed, there appear to have been no addenda at all. Thus, the Forkner Lease I varied from the Turner Lease in the significant respect that it lacked any addendum relating to purchase of the property.[7]

The term of the Forkner Lease I was for one year, beginning in October 2003 and ending in October 2004. The lease provided for automatic month-by-month renewal thereafter subject to either party's right to give a thirty day notice of termination. As with the Turner Lease, this lease included an integration paragraph.

An addendum to the Forkner Lease I was executed in May 2004. This addendum allowed Forkner to sublease with written notice to Latendreesse (described as the "owner"). It also required that the sublease tenant obtain a liquor license, providing that the sublease would become null and void if this did not occur. It further provided: "Tenant and Owner agree that this Lease Agreement and Amendment Number One contains [sic] the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Lease Agreement may be modified in writing, if the writing is signed by the parties obligated under the amendment." Cleveland affid. ex. 3.

---

[7] In his affidavit, Turner asserts that Latendreesse "continued to recognize [the] lease-to-own agreement with [Turner]," despite the execution of the superceding lease with Forkner. Turner affid. ¶ 6. Turner's characterization of the relevant agreement as a "lease-to-own" agreement is, however, directly contrary to the language of that agreement itself which states: "This option is not a lease to buy." Further, the plain language of the option agreement provided that it merely locked in the sale price until a specified date "*or at the end of this lease whichever occurs first*." ex. 2 at C. It is undisputed that the Turner Lease ended in October 2003. The option, therefore, terminated by its own terms on that same date.

7

On May 26, 2004, Forkner as "Landlord" signed a sublease of the property to Plaintiff Boyd J. Jones. Jones signed the agreement in his personal capacity, making no reference to any entity as the tenant. This sublease ran from June 1, 2004, to October 21, 2004, and contained the following provisions of particular relevance to this action:

> **USE OF PREMISES.** Tenant may use the Premises only for Sports Bar, Grill and Entertainment. . . .
>
> **REMODELING OR STRUCTURAL IMPROVEMENTS.** Tenant shall be allowed to conduct any construction or remodeling (at Tenant's expense) that may be required to use the Premises as specified above at Tenant's expense. Tenant will not be reimbursed for any improvements made.

Cleveland affid. ex. 5 at 1 & 3 (also prohibiting the filing of any mechanics liens).

One day later, on May 27, 2004, a new sublease was executed by Jones and Forkner. Cleveland affid. ex. 7. The only apparent difference between the subleases is that the new sublease substitutes "AAA Reliable Detective Agency, Inc. ("AAA"), as Tenant. Jones signed the sublease as president of AAA. The sublease still provided that the use of the property would be "only for [a] Sports Bar, Grill and Entertainment." *Id.*

Despite the distance between the Plaintiffs that might be suggested by these two subleases, Jones was, in fact, being brought in by Forker to assist in running the sports bar and restaurant business as to which she and Turner remained active partners. Forkner affid. ¶ 2 (stating that she, Jones, Turner and Locker Room, LLC were "partner[s] in a joint venture" to operate the Locker Room Sports Bar") & ¶ 3 (referring to verbal partnership agreement with Turner); Turner affid. ¶ 6 (asserting that Forkner, Jones, Turner and Locker Room, LLC operated as partners). Indeed, Forkner and Jones formed Plaintiff, Locker Room, LLC, for the very purpose of owning and operating a club by the name of Locker Room. Forkner affid. ¶ 3 (stating that she and Jones formed

8

Locker Room LLC for these purposes after Jones was brought in to manage the club).[8]

On July 21, 2004, The Locker Room LLC, Jones, Latendreesse, and Jean's Auto Repair (a business run by Latendreesse) entered an agreement relating to use of parking spaces adjoining the Two Notch Road property. Cleveland affid. ex. 8. This is the first reference to Locker Room LLC in any of the lease or related documents.[9] Although he is named as a party to the agreement, Jones signed this document only "for Locker Room, LLC." Forkner is not mentioned in and did not sign this document.

Forkner and Latendreesse entered a second lease for the Two Notch Road property in September 2004. Cleveland affid. ex. 4 ("Forkner Lease II"). This agreement was for a term ending in September 2005 and, as before, indicated that the lease would automatically renew on a month-to-month basis thereafter, absent either party giving a thirty-day notice of his or her intent to terminate. This agreement contained the same prohibition against "alterations" (without written agreement) found in the earlier leases. It was, however, modified to allow for subleasing.[10] Forkner Lease II ¶ 13. As with the Turner Lease and Forkner Lease I, this lease contained an integration clause titled

---

[8] Forkner and Jones met sometime after August 2003, through their joint association with a detective agency which belonged either to Forkner or Jones. *See* Forkner affid. ¶ 3 (stating Forkner and Jones met after August 2003 "through [Forkner's] detective agency" and that, after bringing Jones in to manage the club, they jointly "decided to form . . . Locker Room LLC . . . to own and run the business"); Cleveland affid. ex. 9 (February 2004 agreement between Jones and Forkner allowing Forkner to be associated with AAA Detective Agency which was owned by Jones).

[9] This document refers to the 6201 address as that of the club/sports bar and 6029 as the location of Latendreesse's shop, suggesting, perhaps, that there is but a single building at which dual addresses have been used to designate the different businesses (and related entrances) within that building.

[10] The prior lease agreements prohibited subleasing, although the addendum referenced above modified that prohibition.

9

"Only Agreement," and as with Forkner Lease I, it listed no addenda.

On October 1, 2004, Forkner and Jones executed a new sublease, running from October 1, 2004, through October 1, 2005. Cleveland affid. ex. 6. The agreement is essentially the same as the last sublease discussed above, except that Jones, rather than AAA, is designated as the Tenant. Jones signed this lease in his personal capacity.

On December 16, 2004, a supplemental agreement was entered between The Locker Room, Jones, Forkner, Latendreesse, and Jean's Auto Repair relating to parking. This agreement refers to Forkner as the leaseholder and Jones (individually) as sublessee. It does, however, indicate that Jones is "do[ing] business as The Locker Room, LLC." Cleveland affid. ex. 10. Jones signed "as and for" Locker Room, LLC.

It was around this same time, according to Turner and Forkner, that they first learned that Latendreesse was not the actual owner of the property. This was as a result of Turner seeing a tax receipt listing Rams Head as the property owner but addressed in care of Latendreesse. Turner affid. ¶ 4; Forkner affid. ¶ 5. Turner claims that he assumed from this document that Latendreesse had the authority to act for Rams Head in regard to the property. Turner afid. ¶ 4. Forkner takes a similar position although she claims to have attempted at this point to determine the true owner, albeit unsuccesfully. Forkner affid. ¶ 5.

Any reliance as to ownership at this point in time is, however, of little relevance to the restitution claim as most of the claimed improvements were completed during the period covered by the Turner Lease and, in any event, prior to December 2004. It was around this time that the relationship broke down. As Forkner explained, Latendreesse "refused to sign the purchase agreement" in January 2005, which caused Plaintiffs to lose faith in Latendreesse's ability to convey the property. Forkner affid. ¶ 5. It was at this point and for this reason that Forkner began

withholding rent payments. *Id.*

At some point between January and May 2005, Plaintiffs were evicted from the leased property.[11] Plaintiffs (with the exception of Locker Room LLC) responded by filing a *pro se* state court complaint and *lis pendens* in May 2005. Those documents identified both 6029 and 6201 Two Notch Road as the leased property and named Rams Head as the sole Defendant. The action was, thereafter, removed to this court where it has followed a rather long and tortured path which, fortunately, need not be explained here. *See generally* Dkt No. 64 (Order reopening action, summarizing, in part, the history of this litigation).

## DISCUSSION

Plaintiffs sole remaining claim is a claim for restitution. "Restitution is a remedy designed to prevent unjust enrichment." *Sauner v. Public Service Authority of South Carolina*, 581 S.E.2d 161, 167 (S.C. 2003). "To recover on a theory of restitution, a plaintiff must show (1) that he conferred a non-gratuitous benefit on the defendant; (2) that the defendant realized some value from the benefit; and (3) that it would be inequitable for the defendant to retain the benefit without paying the plaintiff for its value." *Id.* (citing *Niggel Associates, Inc. v. Polo's of North Myrtle Beach, Inc.*, 374 S.E.2d 507 (S.C. App. 1988)). *See also Ellis v.Smith Grading and Paving, Inc.*, 366 S.E.2d 12, 14 (S.C. App. 1988) (stating the same elements in slightly different language).

---

[11] While not expressly stated by any party, it seems likely that this was a consequence of Folkner's decision to withhold payment of rent. In any event, it was a predictable result of that decision.

11

For purposes of the present motion, Defendant concedes that a "benefit" may have been conferred. *See* Dkt No. 85 at 2 (conceding that resolution of the benefit question may involve "a factual debate as to whether the remodeling of warehouse property owned by an industrial firm into a strip club enhances or diminishes the value of the property for such an owner").[12] Defendant's motion, and this order, therefore, focus on the "non-gratuitous" requirement of the first element as well as the latter two elements of the restitution claim.

As Judge Bell explained in *Niggel Associates*,

> For restitution to be warranted, the plaintiff must confer the benefit nongratuitously: that is, it must either be (1) at the defendant's request or (2) in circumstances where the plaintiff reasonably relies on the defendant to pay for the benefit and the defendant understands or ought to understand that the plaintiff expects compensation and looks to him for payment. *It is not enough that the defendant has knowledge of the plaintiff's conduct; he must have induced the plaintiff to confer the benefit*.

*Niggel Assoc.* 374 S.E.2d at 509 (emphasis added).

Plaintiffs have offered no evidence which would satisfy this standard. There is, for example, no evidence that Rams Head requested that the improvements be made. Neither is there any evidence that Rams Head took any other action which might have caused Plaintiffs to rely on the expectation of repayment from Rams Head. There is, in fact, no evidence that Rams Head was even aware that improvements were being made which as noted in *Niggel* would not be enough. Thus, there is no evidence to suggest that any benefit was nongratuitous, especially as to Rams Head.

In this regard, the relationship between Plaintiffs and Rams Head is similar to those between

---

[12] Rams Head's characterization of the nature of the club as a "strip" club differs from the characterizations of the business as a sports bar and restaurant in the various leases, although it may be consistent with the reference to "entertainment" in one of the subleases. Given Rams Head's decision not to challenge the basic question of whether value was added, however, the court need not pry further into what went on (or came off) in the Locker Room.

the plaintiff-contractors and a defendant-lessee addressed in *Niggel* where the court held that the lessee had not been unjustly enriched by work done for a sublessee. As the court explained:

> the Contractors did the work under contracts with [the sublessee]. They expected to be paid by [the sublessee]. They had no dealings whatever with the [lessee]. Indeed, they did not know [the lessee] had an interest in the property when they agreed to perform the work. [The lessee] did not request the work. It did nothing to cause the Contractors to rely on it for payment. It had no reason to suppose the Contractors looked to it for payment. The Contractors were not induced to furnish their labors and materials by any expectation that [the lessee] would pay for them. In these circumstances, [the lessee] had no duty to make restitution to the Contractors.

*Niggel*, 374 S.E.2d at 533.

There is, of course, evidence that *Latendreesse* was aware that the improvements were being made. Plaintiffs have, however, failed to offer any evidence which would allow them to impute Latendreesse's knowledge to *Rams Head*. Thus, Plaintiffs have failed to establish that any benefit was non-gratuitous as to Rams Head.

Even if Latendreesse's knowledge and actions could be imputed to Rams Head, it is doubtful Plaintiffs' claims could survive summary judgment. This is, in part, because the relationship between Latendreesse and Plaintiffs was governed by a series of written contracts (primarily leases and a few addenda).

> There cannot be an express and an implied contract for the same thing existing at the same time. . . . Thus, an express contract precludes the existence of a contract implied by law or a quasi-contract. Also, an action for unjust enrichment cannot lie in the face of an express contract. The rule that an express contract bars a quasi-contract claim holds the contract[ing] parties to their agreement and prevents a party who made a bad business decision from asking the court to restore its expectations.

66 Am. Jur. 2d Restitution and Implied Contracts § 24 (Thomson/West 2007). The existence of the various written agreements governing the subject matter would, therefore, preclude a claim based on an implied contract even if the dealings between Latendreesse and Plaintiffs could be imputed

13

to Rams Head.[13]

The content of the written agreements is also inconsistent with any expectation that Plaintiffs would receive payment for renovations to the building. Although Latendreesse was apparently aware that Plaintiffs were making improvements (arguably a necessity for the intended purpose of the lease), the leases themselves prohibited alterations without written agreement (and no such agreements are offered). The leases also included integration clauses. Given this combination of provisions, it is arguable that Latendreesse could have required Plaintiffs to restore the building to its original condition upon expiration of the lease. In any event, nothing in the leases would support the opposite result: that Latendreesse (or Rams Head if held responsible for Latendreesse's actions) be required to pay Plaintiffs for the "value" of their voluntary alterations to the property. *See Sauner,* 581 S.E.2d at 168 (finding no unjust enrichment where Plaintiffs' claims sought relief which was not allowed by the terms of their leases).[14]

In sum, whether one looks to the written terms of the lease, or the course of the parties' dealings, there is no basis on which to find it inequitable for the "owner" of the property, whether Latendreesse or Rams Head, to retain any benefit which might have resulted from Plaintiffs'

---

[13] As stated in her affidavit, Forkner believed the lease terms in the Turner Lease were unfair and sought, unsuccessfully, to negotiate different terms for her own leases. This, and the other facts set forth above, suggest that Plaintiffs are using this action to seek in quasi-contract relief from what they view as a "bad business decision." As explained in *Niggel*, this is a misuse of the unjust enrichment claim. In any event, Plaintiffs have presented no evidence that either Rams Head or Latendreesse requested that the work be done or took other action which would have caused Plaintiffs to expect that either of them would reimburse Plaintiffs for the improvements.

[14] It is of some note that the subleases between Forkner, Jones, and/or Locker Room, LLC allow for renovations but contain an express prohibition against recovery of renovation costs. Presumably, this prohibition would benefit not only the original lessee (Forkner), who would not be obligated to pay her sublessee for the improvements, but also her landlord (Latendreesse) and, if different, the owner of the property. This prohibition, thus, suggests an understanding that any renovations were solely intended to benefit the tenants, not the owner or landlord.

14

alterations of the building. The conclusion that there is no inequity is even greater as between Plaintiffs and Rams Head because there is no evidence that Rams Head was aware of, much less encouraged or condoned, the renovations.

A number of questions remain regarding the relationship between Latendreesse and Plaintiffs and the manner in which Plaintiffs have prosecuted these claims. For the most part, what is known suggests inconsistencies in Plaintiffs' testimony and other difficulties with Plaintiffs' case. The court need not, however, resolve any of these questions at this stage because it is clear that Plaintiffs cannot prove necessary elements of their sole remaining claim. Thus, any remaining issues of fact are not material to resolution of this action.

## CONCLUSION

For the reasons set forth above, the court finds that Defendant is entitled to judgment as a matter of law. Defendant's motion for summary judgment is, therefore, granted in full. The Clerk of Court is directed to enter judgment in favor of Defendant.

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
September 4, 2007